UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X

WAYNE HARGROVE

       Plaintiff,

   -against-

SHERIFF EDWARD RILEY; NASSAU
COUNTY CORRECTIONAL FACILITY, et
al; NASSAU COUNTY UNIVERSITY
MEDICAL STAFF and NASSAU COUNTY
CORRECTIONAL FACILITY,

      Defendants.

--------------------------------X

<u>MEMORANDUM AND ORDER</u>

Civil Action No.
CV-04-4587 (DGT)

Trager, J:

     Inmate Wayne Hargrove ("Hargrove" or "plaintiff") brings
this <u>pro</u> <u>se</u> action pursuant to 42 U.S.C. § 1983 against the
Nassau County Sheriff, Nassau County Correctional Facility
("NCCF") and NCCF's medical staff, (collectively, "defendants"),
seeking damages for injuries allegedly caused by defendants while
he was incarcerated at NCCF.  Defendants now move for summary
judgment pursuant to Fed. R. Civ. P. 56 arguing, <u>inter</u> <u>alia</u>, that
Hargrove's claims should be dismissed because he failed to
exhaust administrative remedies, as required by the Prison
Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e.  For
the following reasons, defendants' motions for summary judgment
are granted.

**Background**

On August 27, 2004,[1] Hargrove filed a complaint, alleging
that defendants violated his civil rights when they forcibly
administered purified protein derivative skin tests ("PPD test")
to test for latent tuberculosis ("TB") in April 2002, 2003 and
2004 while he was incarcerated at NCCF. Complaint, Ex. C; Aff.
in Opp. at 1-4, Ex. A. Hargrove named Nassau County Sheriff
Edward Reilly ("Reilly"), NCCF and Nassau County University
Medical Staff[2] as defendants.[3] On November 22, 2004, after
discovery, County Defendants and NHCC Defendants filed separate

---

[1] Hargrove signed the complaint August 27, 2004. The pro
se clerk's office received and filed the complaint on September
20, 2004. Under the prison mail-box rule, a pro se prisoner's
complaint is deemed filed when it is delivered to prison
authorities. See, e.g., Walker v. Jastremski, 430 F.3d 560, 562
(2d Cir. 2005)(deeming pro se prisoner's § 1983 action filed on
date complaint was handed to prison officials). There is no
evidence in the record as to when Hargrove handed the complaint
to prison officials. However, it is clear the operative date is
between August 27, 2004 and September 20, 2004. As discussed,
infra, both of these dates occur before Hargrove properly
exhausted the administrative remedies available to him at NCCF.

[2] The Nassau County University Medical Staff are employed
by the Nassau Health Care Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement between the County
of Nassau and NHCC, dated September 24, 1999, NHCC provides
medical services for inmates at NCCF. County Defs.'s Not. of
Motion, Decl., at 1.

[3] Reilly and NCCF are represented separately from NHCC.
Accordingly, when a distinction is necessary, Reilly and NCCF
will be referred to as "County Defendants" and Nassau County
University Medical Staff and NHCC will be referred to as "NHCC
Defendants."

motions for summary judgment pursuant to Fed. R. Civ. P. 56.
Both defendants properly filed a Local Rule 56.1 Statement and
served Hargrove a Notice to Pro Se Litigant Opposing Motion for
Summary Judgment, pursuant to Local Civil Rule 56.2.

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through
medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This
standard process usually takes seventy-two hours. Edwards Aff.
¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of
Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD
test to detect latent TB. Feleke Aff. ¶ 3. However, if an
inmate has previously tested positive for TB, it is NCCF's policy
to test for TB using an x-ray instead.[4] Feleke Aff. ¶ 3. As
part of its Infectious Disease Program, NCCF re-tests inmates for
TB each year, beginning after they have been housed in that
facility for one year. Edwards Aff. ¶ 5.

---

[4] According to WebMD, "[a] tuberculin skin test should not
be done for people who have a (1) Known TB infection [or a]
(2) Positive tuberculin skin test in the past. A second test may
cause a more severe reaction to the TB antigens." Jan Nissl, RN,
BS, Tuberculin Skin Tests, WEBMD,
http://www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan.
31, 2007).

## Hargrove's Tuberculosis Testing at NCCF

On March 15, 2002, Hargrove was incarcerated at NCCF.  NHCC Defs.' 56.1 Statement ¶ 1.  Before entering the general population, Hargrove was processed through medical intake.  NHCC Defs.' 56.1 Statement ¶ 2.  The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis.  NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2.  The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000.  NHCC Defs.' Notice of Mot., Ex. C, at 1.  Hargrove alleges that he was exposed to and treated for TB in 1997.  Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2.  Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection.  NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3.  Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied."  Aff. in Opp. at 3.

Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB.  Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4.

On May 24, 2003, Hargrove was given a PPD skin test. Edwards
Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was
negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4.
According to Hargrove, he requested an x-ray instead of a PPD
test because of his previous exposure to TB, but was forced to
submit to the PPD test. He also alleges that defendants
threatened to put him in "keep lock" or "lock up" unless he
submitted to the PPD test.[5] Complaint, Ex. C; Aff. in Opp. at 1-
4, Ex. A.

　　The following year, in June of 2004, Hargrove was scheduled
to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement

---

[5] Hargrove has made contradictory statements about being
placed in "keep lock" or "lock up". It is unclear whether he is
alleging that defendants threatened to place him in "lock up"
unless he submitted to the PPD test or whether he was actually
placed in "lock up" until such time that he agreed to submit to
the PPD tests. For example, in his complaint, Hargrove states
that when he "refused to submit to another [PPD] test, the
Correctional Authorities were brought in and placed [him] in lock
up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom
on January 31, 2005, Hargrove stated that he took the PPD tests
because he was told that he would be placed in "lock up" until he
submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B
to his complaint, Hargrove alleges both that he was given an
unwarranted TB shot and that when he refused the same shot he was
placed in "keep lock." Complaint, Ex. B. There is no evidence
in the record that Hargrove was ever segregated from the general
population while housed at NCCF, outside of the seventy-two hour
initial medical intake period. Aff. of Sgt. Neumann ("Neumann
Aff.") at 1-2 (referring to prison records showing Hargrove's
holding locations which demonstrate that he was never placed in
"lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was
actually placed in "lock up" is not a material fact for purposes
of this motion; as explained in detail, infra, Hargrove's failure
to exhaust administrative remedies under the PLRA precludes a
consideration of the merits of his Section 1983 claim.

¶ 5.  Because of the contradiction between the negative May 2003
PPD test and his reported positive history, NCCF contacted the
Infectious Disease Department of the Nassau County Medical
Center.  Edwards Aff. ¶ 6.  It was suggested that Hargrove be
given a two-step PPD test, administered fifteen days apart.
Feleke Aff. ¶ 4; Edwards Aff. ¶ 6.  Hargrove was given these two
PPD skin tests in June 2004.  Edwards Aff. ¶ 6; NHCC Defs.' 56.1
Statement ¶ 5.  Again, Hargrove alleges that these tests were
administered against his will and under threat of being placed in
quarantine.  Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's
assistant.  NHCC Defs.' 56.1 Statement ¶ 6.  During this meeting,
Hargrove complained of a dry cough and that the site on his
forearm where the June 2004 PPD tests had been administered was
red and swollen.  NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick
Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD test
and an order was placed in the chart that Hargrove not be
submitted for future PPD tests.  Edwards Aff. ¶ 7; NHCC Defs.'
56.1 Statement ¶ 8.  See also 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were
caused by the PPD tests: chronic coughing, high blood pressure,
chronic back pain, lung infection, dizzy spells, blurred vision
and a permanent scar on both his forearms.  Complaint, Ex. C;

6

Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). <u>Id.</u>

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. <u>Id.</u>

The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams.[6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. <u>Id.</u> If an acceptable resolution cannot be reached, inmates must then proceed through

---

[6] Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does not dispute that he received a handbook outlining the IGP.

7

the formal three-step process set out in the IGP.  Id. at 3.

The first step requires an inmate to submit his grievance form[7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance."[8]  Id. at 2-3.  NCCF indexes all grievance forms filed by inmates in a log book and in a computer system.  Id. at 1, 3.  Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form.[9]  Id. at 3.  The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form.  See, e.g., 11/19/2004 Grievance form.  If the inmate is not satisfied with the decision of the Inmate Grievance

_____

[7]  The grievance forms contain four sections to be utilized throughout all three steps of the IGP.  Section I provides space for the inmate to explain his complaint and the actions he requests as relief.  Section II is for the decision of the Inmate Grievance Coordinator.  Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision."  Section IV provides space for the decision of the Chief Administrative Officer.

[8]  Hargrove has not argued that he was unaware of this five-day deadline.

[9]  There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

Coordinator, the inmate may appeal the determination to the Chief
Administrative Officer.  Williams Aff. at 3.  Finally, if the
inmate is not satisfied with the Chief Administrative Officer's
determination, the inmate may appeal to the New York State
Commission of Correction Citizen's Policy and Complaint Review
Council ("Council").  Id. at 3.  The Council will then render a
final determination.  Id. at 3.


**(4)**

## Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove

In support of his allegations that he continuously informed
defendants that he had been exposed to TB and, therefore, should
not have been given PPD tests, Hargrove submitted three letters
with his complaint, two of which were addressed to the Inmate
Grievance Committee and one of which was addressed to "To whom
this may concern."  Complaint, Exs. A-C.  He also submitted five
complaint letters written to Sheriff Reilly, seventeen sick call
requests and nine grievance forms during discovery and with his
Affidavit in Opposition to Defendants' Motion for Summary
Judgment, explaining that some of the medical records and
notarized letters were "missing."  Aff. in Opp, Ex. A at 2.
Defendants call the authenticity of most of these documents into
question, contending that Hargrove never submitted any grievance

form or complaint letter before he filed his complaint.  County

Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶ ¶

B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate

Grievance Unit, testified that he reviewed all of the grievance

forms, complaint letters and sick call requests annexed to

Hargrove's Complaint and to Hargrove's Affidavit in Opposition to

Defendants' Motion for Summary Judgment.  Williams Aff. at 2.

Williams testified that he examined the grievance records at NCCF

and searched "for any grievances by plaintiff/inmate Hargrove"

and found "only two."[10]  Williams Aff. at 1.  The first

grievance, dated November 19, 2004, complained that the medical

staff continued "forcing [Hargrove] to take a T.B. shot while

[he] keep[s] telling them that [he] has been exposed to T.B."

11/19/2004 Grievance; Williams Aff. at 1.  In response to this

grievance, Hargrove's "positive" TB status was noted in his

medical records and an order was placed in Hargrove's medical

chart, stating that Hargrove not be subjected to future PPD

tests.  11/19/2004 Grievance, Section II; Williams Aff. at 1;

NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7.  In Section III

of the 11/19/2004 Grievance, Hargrove acknowledged that he had

---

[10]  It is NCCF's procedure to forward to the attention of
the Grievance Unit all official grievance forms and complaint
letters – even ones not specifically addressed to the Grievance
Unit.  Williams Aff. at 3.

read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. See April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. See March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy copy of the April 20, 2003 grievance form, with only the handwritten dates changed. The

only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004.  Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel.  See generally Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated documents and photocopied onto the bottom of the complaint letters.  See County Defs.' Mem. of Law at 18-21.  C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation.  Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1.  McDevitt's Notary Log Book shows that he notarized only one document for Hargrove.  This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial.  McDevitt Aff. at 1-2.  Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion.  McDevitt Aff. at 2.  McDevitt states that he never notarized any other documents for Hargrove.  McDevitt Aff. at 2.  However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002.  County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents
bearing the notary stamp and signature of Klein.  Klein had
performed several legitimate notarizations for Hargrove in
connection to Hargrove's criminal trial.  Klein Aff. at 1-2.
Hargrove signed Klein's Notary Log Book acknowledging receipt of
those notarized documents.  Klein Aff. at 2.  However, Klein
states that he never notarized any of Hargrove's letters
addressed to Sheriff Reilly that bear Klein's stamp and
signature.  Klein Aff. at 2.  On all of the documents that
Hargrove submitted bearing Klein's stamp and signature, the dates
and signatures of Klein match identically to the dates on which
he had performed legitimate notarizations for Hargrove in
connection with his criminal trial.  Defendants argue it is clear
that the documents bearing the stamps and signatures of McDevitt
and Klein were not actually notarized by these notaries.  County
Defs.' Mem. of Law at 17-22.

Hargrove does not deny these allegations.  Instead, he
resubmits the documents that McDevitt and Klein testify they did
not notarize with his Affidavit in Opposition and insists that
the documents "refute[] the assertions put forth by the
defendants."  Aff. in Opp. at 2.

## Discussion

### (1)

### Summary Judgment Standard

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Williams v. Metropolitan Detention Center, 418 F. Supp. 2d 96, 100 (E.D.N.Y. 2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. Baisch v. Gallina, 346 F.3d 366, 371 (2d Cir. 2003).

As Hargrove is proceeding pro se, his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001), particularly when civil rights violations are alleged, see, e.g., McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. See,

e.g., <u>Dufort v. Burgos</u>, No. 04-CV-4940, 2005 WL 2660384, at *2
(E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's
complaint, which failed to specify the legal theory or theories
upon which it rested, as, <u>inter alia</u>, a claim under 42 U.S.C.
§ 1983); <u>Williams</u>, 418 F. Supp. 2d at 100 (same).


**(2)**

**Prison Litigation Reform Act**

 **a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve
the quality of prisoner suits." <u>Woodford v. Ngo</u>, --- U.S. ----,
126 S.Ct. 2378, 2387 (2006) (quoting <u>Porter v. Nussle</u>, 534 U.S.
516, 524 (2002)).  It seeks to eliminate unwarranted interference
with the administration of prisons by federal courts, and thus
"'affor[d] corrections officials time and opportunity to address
complaints internally before allowing the initiation of a federal
case.'" <u>Woodford</u>, 126 S.Ct. at 2387 (quoting <u>Porter</u>, 534 U.S. at
525).  <u>See also</u> <u>Booth v. Churner</u>, 532 U.S. 731, 739 (2001).
Formal grievance procedures allow prison officials to reconsider
their policies, implement the necessary corrections and
discipline prison officials who fail to follow existing policy.
<u>See</u> <u>Ruggiero v. County of Orange</u>, 467 F.3d 170, 177-78 (2d Cir.
2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C.
§ 1997e(a), provides the mechanism to reduce the quantity and
improve the quality of prisoners' suits by requiring that prison
officials have the opportunity to address prisoner complaints
through internal processes before allowing a case to proceed in
federal court. Woodford, 126 S.Ct. at 2382 (citing Porter, 534
U.S. at 524). Section 1997e(a) provides that:

> [n]o action shall be brought with respect to
> prison conditions under section 1983 of this
> title, or any other federal law, by a prisoner
> confined in any jail, or other correctional
> facility until such administrative remedies as
> are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition
precedent to any suit challenging prison conditions, including
suits brought under Section 1983. Woodford, 126 S.Ct. at 2383;
Ruggiero, 467 F.3d at 174; Williams, 418 F. Supp. 2d at 100-01.
The exhaustion provision is applicable to suits seeking relief,
such as money damages, that may not be available in prison
administrative proceedings, as long as other forms of relief are
obtainable through administrative channels. Giano v. Goord, 380
F.3d 670, 675 (2d Cir. 2004); see also Woodford, 126 S.Ct. at
2382-83 ("[A] prisoner must now exhaust administrative remedies
even where the relief sought - monetary damages - cannot be

16

granted by the administrative process.") (citing <u>Booth</u>, 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. <u>Woodford</u>, 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use "'all steps that the agency holds out, and doing so <u>properly</u> (so that the agency addresses the issues on the merits).'" <u>Ruggiero</u>, 467 F.3d at 176 (citing <u>Woodford</u>, 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, <u>Jones v. Bock</u>, --- S.Ct. ----, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA "'demands compliance with [that] agency's deadlines and other critical procedural rules.'" <u>Ruggiero</u>, 467 F.3d at 176 (quoting <u>Woodford</u>, 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." <u>Ruggiero</u>, 467 F.3d at 176 (citing <u>Woodford</u>, 126 S.Ct. at 2382).


**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's

complaint; Hargrove was and continues to be confined in a correctional facility, see Berry v. Kerik, 366 F.3d 85, 87 (2d Cir. 2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, see Williams, 418 F. Supp. 2d at 101. See also Sloane v. W. Mazzuca, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

Hargrove has submitted both forged[11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1.

---

[11] Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, see generally Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, see generally Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. Ruggiero, 467 F.3d at 176 ("'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.'") (quoting Woodford, 126 S.Ct. at 2382).

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19, 2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day

time limit in which to file a grievance.[12]

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, _see, e.g._, Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies.  _See, e.g._, _Hernandez v. Coffey_, No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); _Williams_, 418 F. Supp. 2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); _Mills v. Garvin_, No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

---

[12] Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer.  By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement.  _See, e.g._, _Williams_, 418 F. Supp. 2d at 101, 102 (dismissing _pro se_ complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

### (4)

### No Grounds to Excuse Plaintiff's Failure to Exhaust

Exhaustion is an affirmative defense that defendants have the duty to raise. <u>Jones</u>, 2007 WL 135890, at * 8-11; <u>Sloane</u>, 2006 WL 3096031, at *4; <u>Williams</u>, 418 F. Supp. 2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. <u>See</u> <u>Ruggiero</u>, 467 F.3d at 175; <u>Collins v. Goord</u>, 438 F. Supp. 2d 399, 411 (S.D.N.Y. 2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.'")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist

justifying the prisoner's failure to comply with the exhaustion requirement. Ruggiero, 467 F.3d at 175 (citing Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)).[13]

### a. Whether administrative remedies were "available" to Hargrove

The first step in the Hemphill inquiry requires a court to determine whether administrative remedies were available to the prisoner. Hemphill, 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." Id. at 688 (internal quotation marks omitted). In

---

[13] Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in Woodford requiring "proper exhaustion" may have on the three-step Hemphill inquiry. The Second Circuit has yet to address this issue. See Ruggiero, 467 F.3d at 175-76 (declining to "determine what effect Woodford has on our case law in this area . . . because [plaintiff] could not have prevailed even under our pre-Woodford case law). To date, district courts have acknowledged the tension, but resolved to apply Hemphill to exhaustion claims until instructed otherwise by the Second Circuit. See, e.g., Larkins v. Selsky, 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6, 2006) (applying the current law of the Second Circuit to exhaustion claims); Sloane, 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of Woodford, if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); Collins v. Goord, 438 F. Supp. 2d at 411 n.13 (acknowledging that Woodford and Hemphill may be in tension, but deciding exhaustion claims under Hemphill inquiry); Hernandez v. Coffey, No. 99-CV-11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under Hemphill; therefore, there is no occasion to address the potential effect Woodford may have had in his case.

making this determination, "courts should be careful to look at the applicable set of grievance procedures." Abney v. McGinnis, 380 F. 3d 663, 668 (2d Cir. 2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, Ruggiero, 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[14] Hemphill v. State of New York, 380 F.3d 680, 686 (2d Cir. 2004).

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances[15] or that they

---

[14] Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

[15] Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be

threatened him or took any other action which effectively

rendered the administrative process unavailable.

Additionally, Hargrove's transfer from NCCF to Sing Sing

Correctional Facility ("Sing Sing") in July 2005 did not excuse

his previous failure to properly exhaust.  <u>See, e.g.</u>, <u>Sims v.</u>

---

arguing that NCCF's IGP was not available to him because the
Grievance Coordinator failed to respond to his grievances.  In
the single grievance regarding PPD tests that defendants concede
is authentic, Hargrove writes, "[n]ow for the third time your
office refused to answer my grievances so please look into this
matter because the T.B. shot is [sic] effecting my health."
11/19/04 Grievance.  This language implies that Hargrove filed
grievances in the past and received no response from the Inmate
Grievance Coordinator.  Furthermore, Hargrove wrote on one of the
submitted copies of the November 19, 2004 grievance that "[t]his
is the only accepte[sic] that Plaintiff got back from all
grievances and letters that the Plaintiff sent to Sheriff Riley
and his medical staffs about his staff making [sic] take T.B.
test for 3 year[s]."  County Defs.' Not. of Motion, Ex. A,
11/19/2004 grievance.
     First, it must be reiterated that filing of the initial
grievances was untimely.  However, even assuming <u>arquendo</u> that
the original grievances had been timely filed, district courts in
the Second Circuit have held that the "lack of a response from
the [Inmate Grievance Review Committee] does not excuse an
inmate's obligation to exhaust his remedies through available
appeals." <u>Hernandez v. Coffey</u>, 2006 WL 2109465, at *3-5.  <u>See
also</u> <u>Hemphill</u>, 380 F.3d. at 686 ("Threats or other intimidation
by prison officials may well deter a prisoner of 'ordinary
firmness' from filing an internal grievance, but not from
appealing directly to individuals in positions of greater
authority within the prison system"); <u>Acosta v. Corr. Officer
Dawkins</u>, No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July
14, 2005) (inmate required to appeal lack of response to exhaust
administrative remedies); <u>Mendoza v. Goord</u>, No. 00-CV-0146, 2002
U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a
result of a negligent error by prison officials-or even their
deliberate attempt to sabotage a prisoner's grievance-the
prisoner [does not receive a response] on his complaint, he is
not thereby forestalled from appealing").  Hargrove did not
assert or offer evidence suggesting that he appealed the
unresponsiveness or that those appeals were not advanced.

Blot, No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); Santiago v. Meinsen, 89 F.Supp.2d 435, 440-41 (S.D.N.Y. 2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b.  Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." Hemphill, 380 F.3d at 686 (internal citations omitted).

25

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense.  Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers.  See County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1.  County Defendants raised it again in their motion for summary judgment.  See County Defs.' Mem of Law at 15-23.  Thus, defendants are not estopped from raising the affirmative defense now.  See, e.g., Sloane, 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies.  Cf. Ziemba v. Wezner, 366 F.3d 161, 162 (2d Cir. 2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); Feliciano v. Goord, No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with

no information about results of investigation).  Hargrove has not argued otherwise.  <u>See</u> <u>Ruggiero</u>, 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); <u>Sloane</u>, 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); <u>Hernandez</u>, 2006 WL 2109465, at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals).  Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.'" <u>Hemphill</u>, 380 F.3d at 688 (quoting <u>Giano</u>, 380 F.3d at 676).  For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute

a "special circumstance." <u>Giano</u>, 380 F.3d at 676-77.  No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies.  <u>See</u> <u>Sloane</u>, 2006 WL 3096031, at *8; <u>Freeman v. Goord</u>, No. 02-CV-9033, 2004 U.S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y. 2004) (granting motion to dismiss where "there is no evidence in the record ··· of any 'special circumstances' in this action.")


### (5)

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct its own mistakes with respect to the programs it administers." <u>Woodford</u>, 126 S.Ct. at 2385.  <u>See also</u> <u>Ruggiero</u>, 467 F.3d at 178 (citing <u>Porter</u>, 534 U.S. at 525).  Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for

pursuing administrative remedies has not expired.  <u>Berry v.</u>
<u>Kerik</u>, 366 F.3d 85, 87 (2d Cir. 2004).  Dismissal with prejudice
is appropriate where "administrative remedies have become
unavailable after the prisoner had ample opportunity to use them
and no special circumstances justified failure to exhaust."
<u>Berry</u>, 366 F.3d at 88.  Here, Hargrove's administrative remedies
were available to him during his entire period of confinement at
NCCF.  He remained incarcerated in NCCF throughout the time
period in which he alleges the PPD tests were given.  He could
have exhausted remedies for his grievances at any time.
Therefore, Hargrove had ample opportunity to seek administrative
remedies but failed to do so.  Because there is no evidence in
the record that administrative remedies are still available to
Hargrove, as the five-day time period had run, and because
Hargrove has alleged no special circumstances justifying his
failure to exhaust, his complaint is accordingly dismissed with
prejudice.  <u>Berry</u>, 366 F.3d at 88 (upholding dismissal with
prejudice where plaintiff had no justification for his failure to
pursue administrative remedies while they were available.)

Additionally, defendants' have moved for sanctions based on
Hargrove's alleged submission of falsified evidence.  If a party
commits a fraud on the court, the court has the inherent power to
do whatever is reasonably necessary to deter abuse of the
judicial process.  <u>Shangold v. The Walt Disney Co.</u>, No. 03-CV-

9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir. 1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering the presentation of the opposing party's claim or defense." McMunn, 191 F. Supp. 2d at 455 (quoting Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1119 (1st Cir. 1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. See, e.g., Shangold, 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); McMunn, 191 F. Supp. 2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove.

See Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. Scholastic, Inc. v. Stouffer, 221 F. Supp. 2d 425, 444 (S.D.N.Y. 2002) (citing McMunn, 191 F. Supp. 2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously

perpetrated a fraud on the court through his submission of fraudulent documents and sworn affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. See, e.g., Shangold, 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); Scholastic, 221 F. Supp. 2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); McMunn, 191 F. Supp. 2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

## Conclusion

Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.


Dated: Brooklyn, New York
        January 31, 2007


                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge